Territorial Law Library

FILED
SUPERIOR COURT
OF GUAM

JAN 13 PM 1: 28

CLERK OF COURT
BY

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION ) | LAND REGISTRATION CASE |
| ) | NO. LR0002-03 |
| OF ) | |
| ) | |
| THE ESTATE OF GREGORIO S. N. ) | |
| TAINATONGO, DECEASED, represented by ) | |
| GREGORIO B. TAINATONGO and ) | |
| ANGUSTIA T. RIVERA, ) | **FINDINGS OF FACT AND** |
| CO-ADMINISTRATORS, petitioner, for the ) | **CONCLUSIONS OF LAW** |
| registration of title to land designated as Lot ) | |
| No. 499, Dalalaijay, Municipality of Merizo, ) | |
| Guam. ) | |
| _____ ) | |

### INTRODUCTION

This matter came before this Court on January 21st and January 24th, 2008, for trial. Petitioner (Gregorio B. Tainatongo, Angustia T. Rivera, and the Estate of Gregorio S. N. Tainatongo, collectively) was represented by Attorney Edward S. Terlaje. Respondent was represented by Attorney William C. Bischoff. In proceedings where the Court serves as the finder of fact, the court "weighs the evidence, determines the credibility of the witnesses, and finds the facts." *United States v. Bales*, 813 F.2d 1289, 1293 (4th Cir. 1987). "As the trier of fact, the judge may draw all reasonable and legitimate inferences and deductions from the evidence." *State v. Eastman*, 913 P.2d 57 (Haw. 1996).

### DISCUSSION

This Court has jurisdiction over this matter pursuant to 7 G.C.A. § 3105. After reviewing the record, including hearing testimony from the witnesses and examining the exhibits entered into evidence, this Court makes the following findings of fact and conclusions of law by a preponderance of the evidence:

-1-

1. The Petitioner appeared in this action by filing a Petition for Registration of Title to Land on March 17, 2003, claiming title to the subject property in fee simple. Respondent Government of Guam (hereinafter "GovGuam") appeared by filing an Answer to the Petition on April 2, 2004.

2. The subject property is bordered on all sides- North, East, South, and West, by Lot 517, owned by GovGuam. No one other than Petitioner and GovGuam has claimed title to Lot 499. Pursuant to the procedures for this petition, Petitioner effected notice of registration of title by publication in the Pacific Daily News four (4) times, and in three (3) public locations in Merizo.

3. The Petitioner's formal requests are as follows:
   A) that the Court decree that Petitioner is the owner in fee simple of Lot 499 Merizo;
   B) that the Court make an order admitting registration of title pursuant to the Land Title Registration Act (21 G.C.A. § 29101).

4. Respondent GovGuam asks that the Court deny the Petition for Registration of Title to Land.

## CONCLUSIONS OF LAW

### I.      Applicability of *Yamashita*

5. The first issue is the applicability of *Yamashita v. People of Guam,* 59 F.3d 114 (9th Cir. 1995) to the present case. The government argues that *Yamashita* is analogous because the petitioner in *Yamashita*, like Petitioner Tainatongo, asserted title under the same three alternative theories: good record title, adverse possession, and estoppel. Petitioner Tainatongo counter-argues that *Yamashita* is distinguishable because in *Yamashita*, GovGuam did not recognize private ownership in the petitioner, but did so recognize

private ownership in the present case- as evidenced by GovGuam's acceptance of tax payments by the Tainatongos, and the fact that the lot in question has a lot designation number (Lot 499)- which had to have come from GovGuam.

6. It is questionable whether Petitioner Tainatongo advances an adverse possession argument. In the original Petition, it certainly appeared as if adverse possession was a main argument ("The petitioner and its predecessors in interest have been in the *actual, exclusive and adverse possession of said land* for more than five years continuously, last preceding the filing of this petition, claiming to own the same in fee against the world, and have *paid all taxes of every kind and nature legally made or levied against said land during said period.*"). However, in Petitioner's closing argument during trial, Petitioner expressly stated, "We're not asking for adverse possession. We're not trying to seek that. We're just trying to show that there is a chain of title here." Regarding estoppel as an argument, as italicized in the same passage above from the original petition, Petitioner does argue that it has paid taxes on the property at issue. However, there was no mention of 'estoppel' and no indication that this tax assertion was meant as an independent ground for title. Rather, this assertion on taxes paid was a bolstering fact for Petitioner's adverse possession argument which seemingly now has been abandoned. Nevertheless, other surrounding facts make these two cases unmistakably similar. Claimant Yamashita petitioned for registration of the land. Just as the respondent in *Yamashita*, Defendant GovGuam's interest in the lot at issue began with the Spanish cession of Guam to the United States in 1898, which then conveyed the land to GovGuam in 1952. Just as with Petitioner in the instant case, the claimant in *Yamashita* had a chain of title starting with a conveyance decades beforehand (Vicente Crisostomo conveyed to Luis Carbullido in 1916, who then passed it through inheritance to his daughter, Felicita Yamashita, who then conveyed it to claimant Antonio Yamashita). Just as in *Yamashita* with Crisostomo, the 1996 Deed of Gift began a colorable chain of title. Just as in the present case, the claimants and predecessors in interest lived on the property and paid property taxes on it.

-3-

Due to these surrounding circumstances, along with the fact that, as discussed below, GovGuam did *not* recognize private ownership in the present case, this Court is in agreement with GovGuam and treats *Yamashita* as analogous.

## II.    Adverse Possession

7. Despite Petitioner's assertion in its closing argument, this Court will treat adverse possession as having been advanced. Guam's adverse possession statute states, in relevant part:

> An action may be brought to determine the adverse claims to, and clouds upon, title to real property by a person who, by himself or by himself and his predecessors in interest, has been in the actual, exclusive and adverse possession of such property continuously for twenty (20) years prior to the filing of the complaint, claiming to own the same in fee against the whole world, and who has paid all taxes of every kind levied or assessed against the property during the period of five (5) years continuously next preceding the filing of the complaint.

21 G.C.A. § 25111. Civil Code § 1006 adds that "[o]ccupancy for any period confers a title sufficient against all except the Government of Guam or the United States and those who have title by prescription, accession, transfer, will, or succession." This language is mirrored in 21 G.C.A. § 19101 and the tenet is fortified in *United States v. Vasarajs*, 908 F.2d 443 (9th Cir. 1990). Petitioner has offered testimony about its predecessors in interest having occupied the property ever since before World War II, dating back to the 1930s. Notwithstanding this testimony, Petitioner cannot claim this land via adverse possession because doing so would be in direct contravention of §§ 1006 and 19101. Even if Petitioner was offering this pre-WWII-possession testimony to argue that § 1006, which was not passed until 1953, does not apply retroactively, this argument would fail, as it did in *Yamashita*, because Petitioner's predecessors in interest failed to establish title by adverse possession prior to 1953. Therefore, any adverse possession argument, if still advanced by Petitioner, fails.

-4-

### III. Estoppel

8. Petitioner asserted numerous times at trial that it and its predecessors in interest had paid taxes on the subject property. Payment of taxes is evidence of open and notorious possession but does not estop the government from denying title in the person who pays them. *Yamashita v. People of Guam,* 59 F.3d 114 (9th Cir. 1995). Alone, this tax argument would fail. However, this fact of tax payments was incorporated into Petitioner's Chain of Title and Adverse Possession arguments and thus will not be further discussed independently.

### IV. Chain of Title

9. In order to register land in a *Torrens* jurisdiction like Guam, it is the petitioner's burden to prove title against the world, not merely title good against a cloud. *Yamashita v. People of Guam,* 59 F.3d 114 (9th Cir. 1995). A claimant cannot prove good record title if there is no documentary evidence of title in the earliest grantor in his chain of title. *Id.* The claimant can still, however, prove good record title if he can establish registration in favor of any owner in his line of title. *Id.*

10. Petitioner's strongest argument is that fee simple title exists through chain of title. Petitioner argues that the following facts establish its superior and traceable chain of title: Jose Tedpahogo, Jose Tedpahogo Jr., Clare Castro, Gerard Tedpahogo, & Laurie Tedpahogo conveyed to Dolores Eclavea, Vicente Tainatongo, Ramon Tainatongo, Augustina Rivera, and Jose Tedpahogo through an August. 5, 1996 Deed of Gift. Then Dolores and Gregorio Tainatongo (Gregorio was awarded his share in a decree of partition in *In theMatter of the Estate of Geronimo Tainatongo,* PR81-56, in 1958) conveyed their interest in the property to Maria and Jose Tedpahogo via a June 8, 1977 quitclaim deed.

11. GovGuam counter-argues that it possesses superior and traceable chain of title dating back to when the Spanish ceded Guam to the United States in 1898 in the Treaty of Paris, and the United States subsequently conveyed in 1952 lands under its administrative supervision, to the Government of Guam. GovGuam maintains that Petitioner cannot establish title through chain of title because Petitioner cannot show record ownership in the grantors of the 1996 Deed of Gift, nor in Geronimo Tainatongo (whose property was partitioned in 1957).

### A. Documentary Evidence of Title In Earliest Grantor In Line Of Title

12. The facts state that Petitioner and its predecessors in interest occupied and farmed the land. Such family use makes this an agonizing matter. However, Petitioner's inability to establish record ownership in the grantors of the 1996 Deed of Gift is conspicuous.

13. The Department of Land Management's research shows a genuine lack of documentary evidence of title in the earliest grantor in Petitioner's line of title. Andrew Santos, a Land Abstractor III at the Department of Land Management for 15 years, testified that when he researched the title history for Lot 499, other than tax rolls from the 1930s (which as stated above, is not something that Department of Land Management prepares, and cannot in and of themselves be used to estop the government from denying title in the payer of the taxes), he could not find any transfer documents or deeds from the US Government to Geronimo Manibusan Tainatongo, or to any private individual for that matter. There were deeds found from private individual to private individual, but those were dated in the 1970s and 1990s and thus, do not explain the origin of title in the earliest grantor in Petitioner's line of title. *Yamashita.* Even the deed of partition in a probate case filed in 1958 showed no link from the government to the estate of Tainatongo while he was alive.

14. Andrew Santos' research was not faulty. The issue of whether Andrew Santos' research was flawed came up a number of times, but to the best of his knowledge, as well as to the best of Paul L. Santos' knowledge, no books of record for the Merizo area have been lost or burned. Andrew Santos acknowledged that an original grant from the US government to a private individual would be in Volume 1 Merizo and that he did not use that volume in his research. However, he did use the Numeric Index- which would make reference to a certain volume if there are any references to be made, and still, under the Index, there was no evidence of such transfer documents from the US government to any private individual.

## B. Federal Government Recognition of Private Ownership

15. Petitioner argues that the federal government recognized ownership in the Tainagongos when it mentioned a Lot 499 under the Tainatongos' name in a government lease. GovGuam counter-argues that there is no evidence, in the maps or otherwise, that the United States or GovGuam ever recognized private ownership of this land in Petitioner or its predecessors in interest.

16. In *Yamashita*, there was conflicting title opinion and government map evidence regarding whether the United States recognized private ownership in the claimant's predecessors in interest before handing over the land to GovGuam. But because the map evidence weighed in favor of no such recognition, the court upheld the denial of the claimant's land registration. In the present case, there is also conflicting evidence in the federal lease to Kinene and in the maps.

17. The land square maps in Exhibits E and F, when lined up with the maps that the federal government gave to the GovGuam (e.g. Exhibit H), show that the subject property is within the land squares given to GovGuam by the federal government. Therefore,

-7-

Petitioner must prove either recognition of private ownership before such transfer, or a transfer from GovGuam to the original grantor in petitioner's line of title.

18. This Court is satisfied with Paul L. Santos' testimony regarding whether families who could not afford to pay a surveyor during the pre-World War II period would, as a result, be excluded from the surveyor map. Paul L. Santos, Chief of Cadastry and Guam Chief Surveyor at the Department of Land Management, stated that even if the family was a mere *claimant*[1], and not a registered or recorded owner, and even if their land was *unsurveyed*, it would still be labeled as such on the map. Therefore, a family's inability to pay a surveyor during the federal naval administration was not a factor, and the fact that the land at issue was not listed as belonging to or being claimed by the Tainatongos in any federal naval government maps is significant.

19. The only evidence the Department of Land Management has regarding the existence of a Lot 499 is weak and inconclusive. According to the testimony of Paul L. Santos, the only evidence that the Department of Land Management has of the existence of a Lot 499 is the land registration survey map for lot 498 Merizo, prepared by Juan R. Mesa in 1972- referencing Lot 499 on the lower right hand side. This evidence is inconclusive of federal recognition of private ownership because this land registration survey map, at most, only has the certification of the Chief of Cadastry and the Guam Chief Surveyor- which according to Paul L. Santos, "definitely does not constitute a recognition by the government of ownership extending to the area of land surveyed and claimed." Moreover, Paul L. Santos and others at the Department of Land Management researched Lot 499 and looked at maps prior to World War II and prior to 1928, and at maps based on the 1945 triangulation, and there was no indication of Lot 499 anywhere. This

---

[1] Claimant: when the family *was* listed on such naval survey maps as a claimant, as with the registration of Lot 498, the Department of Land Management would not object to such registration. However, there is such an objection in this case because the Tainatongos are not listed on naval administration survey maps, even as mere unsurveyed owners or claimants.

significantly undercuts the possibility of both the federal government's recognition of private ownership in the Tainatongos and of there being traceable title in the earliest grantor in Petitioner's line of title. Furthermore, if the federal naval government meant to recognize the Tainatongos' private ownership of the land and the existence of a Lot 499 by effecting the lease to Vicente Kinene, it more than likely would have labeled such land as Lot 499 and/or belonging to the Tainatongos in other federal government instruments. However, this is not the case. In the 1934 map in Exhibit B, made by the federal naval government, if Lot 499 existed, the tip would have shown up on the lower right hand area, according to Paul L. Santos. However, there is no such indication of a Lot 499 on this map.

20. The lease, signed by naval Governor Wettengel, is problematic to GovGuam, but the tax records and the Department of Land Management's lack of focus on non-subject lots may account for this mishap. In #1 of Andrew Santos' findings in his June 18, 2003 abstract, he acknowledged that the land in question was given a lot number (Lot 499) and that from 1937 through 1941, Gregorio Tainatongo was being assessed property taxes for the land. He also acknowledged the government assigns lot numbers- which come mainly from deeds filed with the Department of Land Management. In Exhibit A, an October 20, 1920 lease of government land to Vicente Kinene, the Naval Governor Wettengel (federal government) described the leased federal government land as being bordered on the north and west by the property of Ramon Baza, bordered on the south by government land, and bordered on the east by the property of Geronimo Tainatongo. Three issues immediately spring from this. First, the issue of why would the federal government have made such a statement if there were no such Lot 499, or if it did not in fact belong to Geronimo Tainatongo; Second, the issue of whether federal government recognition of privately owned land is valid via a lease, or whether it has to be through a registered deed; Third, the issue of whether such recognition is outweighed by other testimonial evidence. It is plausible that the reason why the government lease stated that the lot to

the east belongs to Tainatongo was because of these tax records stating that Tainatongo had been assessed tax for the land- which, again, were legally collected and thus were on record, but cannot in and of themselves be used to estop the government from denying title in the payer of the taxes. *Yamashita*. It is also plausible, according to Paul L. Santos, that because the subject of the map (prepared by Mesa) that does show Lot 499 was Lot 498, it is possible that the adjoining lots were not accurate. Paul L. Santos adds that when the Department of Land Management reviews maps, it reviews it with regards to the subject lot, and not necessarily to the adjoining lots. This makes it quite possible that Lot 499 was erroneously made up. Although Andrew Santos acknowledged that Governor Wettengel's signing the lease could have meant that the Tainatongos may have owned a *portion* of the lot to the east of the leased property, there simply is no documentary evidence to support this supposition. Moreover, Andrew Santos noted that the land to the east in the lease could have been so labeled merely because it had been *leased* to the Tainatongos.

21. It is possible that the Tainatongos acquired 'possesory information title', but no information on such title has been found. In Exhibit 22, an English translation of the Spanish record, there are procedures through which landowners before World War II acquired title to property, one of which was called 'possessor information'. In summary, to acquire title through 'possessor information', the landowner would appear before the Court of First Innocence and provide testimony that the subject lot is his property, and then the judge (who was the Governor at the time) would, at his discretion, issue 'possessory information title'. Paul L. Santos has heard of this method of obtaining title, and it is his testimony that it is "quite possible" that the Tainatongos acquired their title in this manner. However, if this were the case, then the federal naval government would have undoubtedly taken record of such title and included Lot 499 in its subsequent land instruments and maps and deeds. Unfortunately for Petitioners, as stated above, the map in Exhibit B is one example where the federal naval government failed to so include any

'possessory information title'. Paul L. Santos added that he has found no information as far as 'possessory information title' in the Tainatongos.

22. Andrew Santos specifically researched as far back as the 1930s, in the Merizo II Volume and under unregistered lands in the Numeric Indexes, to find any 'possessory information' for a Lot 499, or in the Tainatongos, and could not find anything.

23. The extent of Dr. Tainatongo's testimony was the location of trees- some in a line, some not, some at corners, some bearing fruit; and his memories of his family having lived and ranched the land. Dr. Tainatongo's testimony displayed a definite familiarity with and presence on the land. However, more must be shown in order to establish title to the land.

24. From the testimony of both employees of the Department of Land Management, this Court finds no reason to suspect any intentional misplacement or destruction of Merizo Volume I- if it ever existed. This Court acknowledges that Merizo Volume I would have been an effective tool in this registration analysis. However, in its absence, it remains the Petitioner's burden to establish clear traceable title, and without more, the mere possibility of the Volume's existence cannot be weighed as significant evidence of such title. No facts have been introduced in evidence as to registration by any owner in Plaintiff's line of title. Petitioner has failed to meet its burden of establishing estoppel as a matter of law, adverse possession, or clear traceable title through registration, 'possessor information', or otherwise. Therefore, this Court hereby DENIES the instant Petition for Registration of Title to Land.

25. The Court will consider a motion for reimbursement of property taxes, with interest.

-11-

26. All findings of fact may be interpreted as conclusions of law and *vice versa*.

**SO ADJUDGED**, this 12th day of January, 2009.



Honorable Alberto C. Lamorena III
Presiding Judge
Superior Court of Guam



I do hereby certify that the foregoing is a full true and correct copy of the original on file in the office of the clerk of the Superior Court of Guam. Dated at Hagatna, Guam.

JAN 1 3 2009

Dolorosa M. Nero